WILEY v HENRY FORD COTTAGE HOSPITAL

Docket No. 233220. Submitted May 20, 2003, at Detroit. Decided July 10, 2003, at 9:05 A.M. Leave to appeal sought.

Olga and Antley Wiley brought a medical malpractice action in the Wayne Circuit Court, Kaye Tertzag, J., against Henry Ford Cottage Hospital after Olga Wiley received a cut on her lower right leg as nurses transferred her to a wheelchair. The plaintiff was still recovering from an amputation of her left leg when the cut to her right leg occurred. The cut on her right leg never healed, and allegedly resulted in the subsequent amputation of the plaintiff's right leg, rendering her a double amputee. A jury trial resulted in a judgment in favor of the plaintiff. The defendant appealed, arguing that the trial court erred in denying its motion for a directed verdict, or for judgment notwithstanding the verdict, because the plaintiff failed to establish the standard of care, a breach of the standard of care, and causation. The defendant further argued that its motion for a new trial was improperly denied because the verdict was against the great weight of the evidence and was excessive, and because the plaintiff's attorney committed misconduct. Lastly, the defendant claimed that the trial court erred by concluding that the statutory cap on noneconomic damages set forth in MCL 600.1483 is unconstitutional.

The Court of Appeals held:

1. The testimony of the plaintiff's nurse expert witness was not improper because the record reveals that she did not merely testify regarding how she would transfer a patient, but testified how a transfer should be done in general. This testimony established part of the standard of care owed in transferring a patient, the remainder of which was established by another witness, although that witness was not called as an expert. Similarly, the plaintiff's nurse expert testified that she believed the standard of care was breached in this case, and this opinion was further supported by additional testimony that only one nurse helped transfer the plaintiff, that no gait belt was used during the transfer, and that the plaintiff's wheelchair may have lacked protective padding. Finally, there was sufficient evidence in the record that the amputation of the plaintiff's right leg was ultimately caused by the laceration

because it failed to heal properly. The trial court did not err in denying the defendant's motion for a directed verdict or for judgment notwithstanding the verdict.

2. The defendant's motion for new trial on the basis that the verdict was against the great weight of the evidence was properly denied for the same reasons the defendant's motions for a directed verdict and for judgment notwithstanding the verdict were denied. The jury's verdict was not excessive and was within the range of evidence presented at trial, and did not appear to have been induced by bias or prejudice. There was testimony that the plaintiff could no longer care for her children or her husband, that her life had dramatically worsened, and that becoming a double amputee was significantly more debilitating than remaining a single amputee.

3. The trial court did not err in denying the defendant's motion for a new trial based on allegations that the plaintiff's counsel committed misconduct by making several inappropiate statements during the trial. The plaintiff's counsel's statements regarding charting deficiencies, what the plaintiff would prove, the defense counsel's firm and his relationship with the defense expert, and the counsel's reference to a witness as "Mr. Vascular doctor guy," were either necessary and supported by the evidence, harmless, or otherwise did not rise to the level of belittling the witness. There was no evidence that the plaintiff's counsel engaged in a deliberate course of conduct aimed at preventing a fair trial that had a controlling effect on the verdict.

4. MCR 7.215(J)(1) constrains the Court of Appeals to follow *Zdrojewski v Murphy*, 254 Mich App 50 (2002), and hold that the cap on noneconomic damages in medical malpractice actions set forth in MCL 600.1483 is constitutional. Were it not for *Zdrojewski*, the trial court's opinion would be affirmed because the cap on noneconomic damages violates the right to trial by a jury guaranteed by the Michigan Constitution. The right to a jury trial extends to the determination of damages. To the extent that MCL 600.1483 allows a jury to determine the facts and the amount of damages, but then requires the arbitrary reduction of the damage award to the statutory limit, it renders the jury's function illusory and violates a plaintiff's right of trial by jury. Const 1963, art 1, § 14.

5. The plaintiff's argument that this case involved ordinary negligence and not a claim of medical malpractice so that MCL 600.1483 does not apply fails. The plaintiff's claim was of medical malpractice because an ordinary layman lacks knowledge regarding the appropriate methods and techniques for transferring a patient. Furthermore, the plaintiff labeled the claim as one of medical malprac-

tice, pursued the matter as a medical malpractice claim, and the trial court instructed the jury on professional negligence.

Affirmed in part, reversed in part, and remanded to the trial court for application of the cap on noneconomic damages.

KELLY, J., concurring in part and dissenting in part, stated that she agrees with the majority's opinion and conclusion, with the exception that she does not believe MCL 600.1483 is unconstitutional for the reasons set forth in *Zdrojewski v Murphy*, 254 Mich App 50 (2002), and *Phillips v Mirac*, 251 Mich App 586 (2002).

*Barbara H. Goldman* and *Richard E. Shaw* for the plaintiffs.

*Willmarth, Tanoury, Ramar, Corbet, Garves & Shaw* (by *Linda M. Garbarino* and *Anthony J. Paradiso*) for the defendant.

Before: JANSEN, P.J. and KELLY and FORT HOOD, JJ.

JANSEN, P.J. In this medical malpractice case, defendant Henry Ford Cottage Hospital appeals as of right an order of judgment for plaintiffs Olga and Antley Wiley. We affirm in part and reverse in part.

I. BASIC FACTS

In March 1997, plaintiff Olga Wiley,[1] who suffered from diabetes, underwent amputation of her left leg at Henry Ford Hospital. The amputation was required because of nonhealing ulcers on the plaintiff's leg. After the amputation, plaintiff remained at Henry Ford Hospital for approximately ten days. Thereafter, she was transferred to Henry Ford Cottage Hospital for therapy. While nurses attempted to move plaintiff from the toilet to her wheelchair, plaintiff sustained a

[1] Because Antley Wiley's claim is a derivative claim for loss of consortium, the singular term "plaintiff" will be used in this opinion to refer to Olga Wiley. Antley Wiley will be referred to by name.

laceration to the front of her right lower leg. This laceration was slow to heal, but plaintiff was discharged. Plaintiff was later readmitted for treatment of ulcerations on her right leg. Ultimately, the right leg was amputated. Plaintiff alleged that defendant's negligence in causing the laceration resulted in the loss of her right leg and rendered her a double amputee.

## II. DIRECTED VERDICT/JUDGMENT NOTWITHSTANDING THE VERDICT

Defendant first argues that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict (JNOV). We disagree.

### A. STANDARD OF REVIEW AND GENERALLY APPLICABLE LAW

This Court reviews de novo a trial court's grant or denial of a directed verdict. *Derbabian v S & C Snowplowing, Inc*, 249 Mich App 695, 701; 644 NW2d 779 (2002). In doing so, we view the evidence in the light most favorable to the nonmoving party. *Id.* at 701-702. Further, this Court recognizes the unique opportunity of the jury and the trial judge to observe witnesses and the fact-finder's responsibility to determine the credibility and weight of the testimony. *Zeeland Farm Services, Inc v JBL Enterprises, Inc*, 219 Mich App 190, 195; 555 NW2d 733 (1996). If reasonable jurors could honestly have reached different conclusions, this Court may not substitute its judgment for that of the jury. *Hunt v Freeman*, 217 Mich App 92, 99; 550 NW2d 817 (1996).

This Court reviews de novo the trial court's decision on a motion for JNOV. *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633

(1999). We review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. *Attard, supra.* The motion should be granted only if the evidence fails to establish a claim as a matter of law. *Orzel v Scott Drug Co*, 449 Mich 550, 557-558; 537 NW2d 208 (1995).

"In a medical malpractice case, the plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995).

### B. STANDARD OF CARE

Defendant argues that the trial court erred in denying its motions for directed verdict and JNOV because plaintiff failed to establish the standard of care with expert testimony. We disagree.

The common-law standard of care applies to malpractice actions against nurses. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 20; 651 NW2d 356 (2002). Therefore, the applicable standard of care is the skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar localities. *Id.* at 22. Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community. *Locke v Pachtman*, 446 Mich 216, 223; 521 NW2d 786 (1994).

Defendant argues that plaintiff's only nursing expert, Donna Rice, R.N., did not establish the standard of care because she testified only about what she would have done. Defendant correctly points out that the standard of care is not based on how a particular health care professional would act. *Carbonell v Bluhm*, 114 Mich App 216, 224; 318 NW2d 659 (1982), citing *Rytkonen v Lojacono*, 269 Mich 270; 257 NW 703 (1934). The use of the pronoun "I" in discussing the standard of care is improper. *Id.* After a thorough review of Rice's testimony, it is clear that Rice testified that the standard of care requires the nurse to assess himself, the patient, the equipment, and the surroundings. Rice did not testify that this is only something she does, but rather, that this should be done in general. When Rice used the word "I" it was, by way of example, an explanation of how in assessing herself she would not lift a patient above a certain weight. Therefore, this testimony was not improper and it served to establish part of the standard of care, namely, that a nurse must assess the totality of the circumstances in deciding how to transfer a patient. Additionally, Thomas Biecker, R.N., although not called as plaintiff's expert witness, provided expert testimony as a registered nurse employed by defendant. A plaintiff may establish the standard of care through defense witnesses. *Porter v Henry Ford Hosp*, 181 Mich App 706, 710; 450 NW2d 37 (1989), citing MCL 600.2161.

On the basis of Rice and Biecker's testimony, plaintiff established that the standard of care in transferring a patient, such as plaintiff, includes several factors: that the nurse assess his ability and the ability of the patient, as well as the surrounding circumstances,

that two nurses perform the transfer, use of a gait belt, preventive care of lower limbs, patient education, and waiting until the patient is ready to move. In its more specific aspects, the standard of care requires that "the patient be at a direct angle to the nurse, that is, in front of the patient so that you have the knees positioned correctly, putting the patient straight up, making sure the position is correct and making the pivot, watching the feet and bringing them down and into the wheelchair."

### C. BREACH OF THE STANDARD OF CARE

Defendant also argues that the trial court erred in denying its motions for directed verdict and JNOV because that plaintiff failed to present sufficient expert testimony to prove a breach of the standard of care. We disagree.

Expert testimony is required in medical malpractice cases to establish the applicable standard of care and to demonstrate that the defendant somehow breached that standard. *Wischmeyer, supra* at 484; *Birmingham v Vance*, 204 Mich App 418, 421; 516 NW2d 95 (1994); *Moy v Detroit Receiving Hosp*, 169 Mich App 600, 605; 426 NW2d 722 (1988).

In this case, there was sufficient expert testimony to establish that it was more likely than not that defendant breached the standard of care. Although Rice testified that an injury could occur in the absence of negligence, she did not agree that this was the case here. Rice testified: "I believe the nurses did not follow the proper procedure to transfer the patient." Rice further testified:

*Q.* And your opinion is the nursing care was proper or improper?

*A.* Improper.

\*     \*     \*

*Q.* Was there a violation of the standard of practice of nursing care as it relates to the transfer of Olga Wiley?

*A.* I believe there was.

\*     \*     \*

*Q.* Do you believe that the laceration of 3-29 was caused by the negligence of the nurses in this case?

*A.* Yes.

This testimony, along with Rice and Biecker's testimony about the standard of care, was sufficient to show that defendant did not comply with the standard of care. Although Rice's other testimony may appear to contradict these statements, her credibility remains a question for the trier of fact. *Zeeland Farm Services, supra* at 195.

Additionally, the evidence presented at trial provides factual support for the experts' opinions. "This Court has held that an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999). MRE 703 also provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. The court may require that underlying facts or data essential to an opinion or inference be in evidence.

In this case, Shelly Ostrowsky testified that she did not assist Karen Nunn in moving plaintiff. Thus, the

evidence showed that only one nurse transferred plaintiff. When asked if there was protective padding on plaintiff's wheelchair, Ostrowsky testified that she could not recall. Ostrowsky also testified that a gait belt was not used in the transfer. Therefore, the underlying facts essential to the experts' opinions were in evidence.

### D. CAUSATION

Defendant also argues that the trial court erred in denying its motions for directed verdict and JNOV because plaintiff failed to prove that the laceration ultimately caused the amputation of plaintiff's right leg. We disagree.

Proof of causation requires both cause in fact and proximate cause. *Haliw v Sterling Hts*, 464 Mich 297, 310; 627 NW2d 581 (2001). Cause in fact requires that the harmful result would not have come about but for the negligent conduct. *Id.* Cause in fact may be established by circumstantial evidence, but such proof must be subject to reasonable inferences, not mere speculation. *Skinner v Square D Co*, 445 Mich 153, 163-164; 516 NW2d 475 (1994); *Meek v Dep't of Transportation*, 240 Mich App 105, 119; 610 NW2d 250 (2000). An explanation that is consistent with known facts but not deducible from them is impermissible conjecture. *Skinner, supra* at 164; *Karbel v Comerica Bank*, 247 Mich App 90, 98; 635 NW2d 69 (2001). Proximate cause is that which, in a natural and continuous sequence, unbroken by new and independent causes, produces the injury. *McMillan v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985). It involves a determination that the connection between the wrongful conduct and the injury is of such a nature

that it is socially and economically desirable to hold the wrongdoer liable, and depends in part on foreseeability. *Lamp v Reynolds*, 249 Mich App 591, 599-600; 645 NW2d 311 (2002).

The record contains sufficient evidence of causation to support plaintiff's case. Stuart Hodosh, M.D., testified that the laceration was a "major contributing factor to her losing her right leg . . . . It's the first shot or the first domino effect where one starts causing a chain reaction of what transpired to the final conclusion as far as her losing her leg." Hodosh testified quite definitely that without the laceration, plaintiff would have kept her leg.

Defendant argues that Hodosh also testified that if the laceration had been healing normally, there probably would not have been a causal relationship between the laceration and the ulcer on the calf. However, there was evidence that the laceration was not healing normally. A nursing note dated April 6, 1997, reports: "Right shin steri-strips with sutures underneath with scant drainage—brownish cleansed and bacitracin applied—also right calf." Also, a medical record indicated that plaintiff "had increased swelling, she had a temperature, the extremity felt warm, the sutures weren't healing, it was weeping." Samuel Park, M.D., recorded his observation on the discharge summary that there was a "nonhealing wound" at the site of the laceration. On June 6, 1997, Park also observed a wound on the right leg that was "slow to heal." At the time of the amputation, the ulcerations appeared as one giant ulcer. The laceration was on the *front* of plaintiff's leg. The note said, "irregular 8 centimeter, discolored, scaly, partially healed ulceration over *anterior* lower leg just below

the knee." Therefore, Hodosh's testimony that the amputation was caused by the laceration was consistent with the evidence.

Viewing the evidence in the light most favorable to plaintiff, the trial court did not err in denying defendant's motion for a directed verdict based on causation because reasonable jurors could have honestly reached different conclusions. The trial court also did not err in denying the motion for JNOV because the evidence did not fail to establish a claim as a matter of law.

### III. NEW TRIAL

Defendant next argues that the trial court erred in denying its motion for a new trial. We disagree.

### A. STANDARD OF REVIEW

On appeal, this Court reviews a trial court's decision whether to grant a new trial for an abuse of discretion. *Bean v Directions Unlimited, Inc*, 462 Mich 24, 34-35; 609 NW2d 567 (2000). An abuse of discretion occurs when the decision was so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias. *Id.* When a party claims that a jury verdict is against the great weight of the evidence, this Court may overturn the verdict only when it is manifestly against the clear weight of the evidence. *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 194; 600 NW2d 129 (1999). The jury's verdict should not be set aside if there is competent evidence to support it. *Id.*

A trial court may grant a new trial when the damage award is excessive. MCR 2.611(A)(1)(c)-(d).

Although the trial court should consider a number of factors, such as whether the verdict was induced by bias or prejudice, the trial court's inquiry is limited to objective considerations related to the actual conduct of the trial court or the evidence presented. *Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989); *Phillips v Mazda Motor Mfg (USA) Corp*, 204 Mich App 401, 416; 516 NW2d 502 (1994). This Court considers the evidence in the light most favorable to the plaintiff when reviewing the trial court's exercise of discretion regarding remittitur. *Phillips v Deihm*, 213 Mich App 389, 405; 541 NW2d 566 (1995).

### B. GREAT WEIGHT OF THE EVIDENCE/REMITTITUR

Defendant contends that the trial court erred in denying its motion for new trial because the verdict was against the great weight of the evidence and excessive. We disagree.

For the reasons discussed above, the trial court did not err in denying defendant's motion for a new trial because there was competent evidence to support the verdict. On appeal, defendant does not provide any discussion or analysis regarding the excessiveness of the verdict. An appellant may not merely announce its position or assert an error and leave it to this Court to discover and rationalize the basis for its claims, unravel or elaborate its argument, or search for authority for its position. *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998).

Nonetheless, we find that the jury's verdict in this case was within the range of evidence produced at trial and does not appear to have been induced by bias or prejudice. Gerald Zelenock, M.D., testified that

the major cause of the amputation was plaintiff's pain and discomfort and progressive ulcerations. Plaintiff testified that since the amputation, she could no longer care for her family consisting of her husband, four children, and thirteen grandchildren. Plaintiff also testified that her life has changed since the second amputation and "has been going down hill ever since then." Plaintiff further testified that she can no longer use the bathroom, that she wears diapers and uses a bedpan. In addition, plaintiff has to stay at a continuous care facility and only returns to her home for twenty-nine days a year. According to the testimony, plaintiff's husband, Antley Wiley, cries each time she gets ready to leave, and plaintiff hates to leave her husband all alone.

Hodosh testified:

> If a person has one leg amputated and the other one is still good, it makes life tremendously more easier [sic] for them.
>
> One is they may be able to get a prosthesis to wear. The second is, even if they don't get a prosthesis, they can still get out of bed into their wheelchair without help. They can go to the bathroom with the wheelchair. They can get from the wheelchair to the toilet, and they can get around fairly well. And that is by weight bearing on the extremity that is left and rotating on it. A lot of people have an amputation and are not dependent on anybody else.
>
> With a double amputee, they cannot do anything as far as getting out of bed. Essentially, they have to be picked up, put in a wheelchair or picked up, taken to the bathroom or any other activity. So there is a tremendous amount of difference between having one leg and not having any leg.

Seventy-five year-old Antley Wiley testified that he and plaintiff have been married for fifty-two years. Wiley does not feel comfortable living apart from his

wife. He testified that plaintiff used to cook for him, wash the clothes, and clean the house. Now Wiley has to do these things for himself.

On the basis of this testimony, the verdict was within the range of the evidence and was not based on bias or prejudice. Therefore, the trial court did not err in denying defendant's motion for a new trial on this basis.

### C. ATTORNEY MISCONDUCT

Defendant also argues that the trial court erred in denying its motion for a new trial based on attorney misconduct. We disagree.

In *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982), our Supreme Court set forth the following rules for analyzing an attorney misconduct claim:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted.

Furthermore, an attorney's comments during trial warrant reversal where "they indicate a deliberate course of conduct aimed at preventing a fair and

impartial trial or where counsel's remarks were such as to deflect the jury's attention from the issues involved and had a controlling influence on the verdict." *Ellsworth, supra* at 192.

Defendant cites several instances of alleged attorney misconduct on the part of plaintiff's counsel. First, defendant argues that despite the trial court's ruling that plaintiff did not plead a case of negligent charting, plaintiff's counsel "constantly injected the negligent charting issue before the jury." The record indicates that the trial court ruled on this issue before trial. On the fifth day of trial, the trial court stated that plaintiff "can go forward with the transfer aspects of the case, I indicated you can refer to the charting, but I thought my ruling was you can't refer to it as negligent charting or something of that nature." The trial court further clarified at this point in the trial that the approach "by way of the question and answer—should be omitted during the rest of the trial."

To the extent that plaintiff's counsel addressed the charting deficiencies in this case without discussing negligent charting per se, his conduct was not improper. Plaintiff's counsel attempted to prove that the charting was inaccurate or entirely lacking a description of the event at issue. This was not improper because it circumstantially created a picture of the care plaintiff received. It also alerted the jury to the fact that the records did not contain pertinent information about plaintiff's care, and that this information had to be derived from the witnesses' testimony. This approach was also necessary because, without proof by way of records about the alleged negligent care, the jury might have thought that plain-

tiff could not prove her case. Plaintiff's counsel had to emphasize that no charting for the event existed, thus, he had to rely on testimony to prove how the incident occurred. To the extent that plaintiff's counsel improperly elicited Rice's testimony about negligent charting, the effect was harmless and did not have a controlling influence on the verdict because Rice also testified that insufficient charting did not result in negligent nursing care. Moreover, defense counsel, himself, questioned Rice, at length, about the lack of information in the records.

Defendant also argues that plaintiff's counsel made three comments during his opening statement that were not supported by the evidence. To begin with, the purpose of an opening statement is to tell the jury what the advocate will attempt to prove. A party may succeed or fail in this attempt. If a party fails to prove its case, the proper remedy is a motion for a directed verdict, for JNOV, or for a new trial. As discussed above, the trial court properly denied those motions. In any event, two of the statements defendant complains of were supported by evidence. Plaintiff's counsel commented that plaintiff indicated she was not ready to be transferred but was anyways, and that plaintiff's expert would testify that there should have been something on plaintiff's wheelchair making it sturdy. Rice testified that after reading plaintiff's deposition testimony, she thought plaintiff was not ready to be transferred. Rice also testified that "preventative care" is important in transferring a diabetic patient. Although a third comment made by plaintiff's counsel that "Nurse Richardson was going to ask for something called an intervention" was not supported by the evidence, defendant fails to show what prejudi-

cial effect this comment had on the outcome of the case. Furthermore, there is no indication of a deliberate course of conduct aimed at preventing a fair trial, the statement did not deflect the jury's attention from the issues involved, and did not have a controlling influence on the verdict. *Ellsworth, supra* at 191-192.

Defendant also argues that plaintiff's counsel improperly mentioned that defense counsel was from "a very large firm," and also questioned counsel's relationship with his expert by asking, "Any other lawyer send cases from his firm to you?" This was not an improper question as it concerned the defense expert witness's credibility. Defense counsel similarly questioned plaintiff's expert regarding how many cases he has reviewed and whether those cases were for plaintiff or defense firms.

Defendant further argues that plaintiff's counsel improperly questioned defendant's expert Zelenock regarding how much he charged for expert review, to which Zelenock responded "I really don't like the way you said that." Here, the witness's response has no bearing on the determination whether the question was improper.[2] Furthermore, expert witnesses are routinely questioned about their fees for providing expert services. Defense counsel asked similar questions of plaintiff's expert. The questioning was not improper and, even if it was, it did not have a controlling influence on the verdict.

---

[2] We note that the trial court admonished the expert stating:

> Excuse me. Excuse me. He has a right to question you, doctor. If you can't answer the question presented, just ask the court. If you can't . . . just say, "I can't answer it yes or no," then we will move to the next question or I will ask you to explain your answer. . . . But he is entitled to ask the questions he sees fit.

Defendant also complains that plaintiff's counsel spoke loudly at a sidebar conference allowing the jury to hear him. However, the record does not reflect what was said so there is no basis for this Court to conclude that the comment had a prejudicial effect on the trial. The bad intent defendant implies on the part of plaintiff's counsel is also undermined by the fact that plaintiff's counsel requested that the jury be excused just before the sidebar conference, which the trial court denied. Thus, there was no deliberate course of conduct aimed at preventing a fair trial that had a controlling influence on the verdict. *Id.* at 191-192.

Finally, defendant also complains that plaintiff's counsel improperly referred to Zelenock as "Mr. Vascular doctor guy." "Counsel is not entitled to belittle a witness . . . ." *Powell v St John Hosp*, 241 Mich App 64, 80; 614 NW2d 666 (2000). Counsel may comment on a witness's bias. *Reetz, supra* at 109. An attorney is not required to state his case in the blandest of all possible terms. Here, while defendant finds this moniker disrespectful, it was not improper, nor did it rise to the level of belittling the witness. In any event, the trial court instructed the jury: "[Y]ou should disregard anything said by an attorney which is not supported by evidence." Therefore, the disputed conduct was either not improper, or it was harmless and did not have a controlling influence on the verdict.

### IV. CAPS ON NONECONOMIC DAMAGES

Defendant next argues that the trial court erred in denying its request to apply the statutory cap on noneconomic damages in medical malpractice actions

under MCL 600.1483. We agree, only because we are required to follow *Zdrojewski v Murphy*, 254 Mich App 50, 74-82; 657 NW2d 721 (2002), a prior published decision of this Court issued after November 1, 1990. MCR 7.215(J)(1).

### A. CONSTITUTIONALITY OF MCL 600.1483

Constitutional issues are reviewed de novo. *McDougall v Schanz*, 461 Mich 15, 23; 597 NW2d 148 (1999). The trial court ruled that the cap on noneconomic damages in medical malpractice actions found in MCL 600.1483 is unconstitutional. In *Zdrojewski, supra*, this Court held that the noneconomic damages cap set forth in MCL 600.1483 is constitutional. However, pursuant to MCR 7.215(J)(2) we disagree with the holding in *Zdrojewski, supra*, that MCL 600.1483 is constitutional.[3] We would hold that the medical malpractice noneconomic damages cap in MCL 600.1483[4] violates the right to trial by jury as guaranteed by the Michigan Constitution. Const 1963, art 1, § 14.

---

[3] We recognize that similar provisions have been held constitutional in *Phillips v Mirac, Inc*, 251 Mich App 586; 651 NW2d 437 (2002) (noneconomic damages cap in actions against the lessor of a vehicle, MCL 257.401[3]), and recently in *Kenkel v Stanley Works*, 256 Mich App 548; 665 NW2d 490 (2003) (noneconomic damages cap in products liability cases, MCL 600.2946).

[4] The statute at issue, MCL 600.1483, provides in relevant part:

   (1) In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed $280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to section 6304, in which case damages for noneconomic loss shall not exceed $500,000.00 . . . .

The right to trial by jury is guaranteed by the Michigan Constitution, which provides: "The right of trial by jury shall remain, but shall be waived in all civil cases unless demanded by one of the parties in the manner prescribed by law." *Id.* This constitutional right to trial by jury extends to the determination of damages. *Leary v Fisher*, 248 Mich 574, 578; 227 NW 767 (1929); *Mink v Masters*, 204 Mich App 242, 246-247; 514 NW2d 235 (1994); *Equico Lessors, Inc, v Original Buscemi's, Inc*, 140 Mich App 532, 536; 364 NW2d 373 (1985); *Waisanen v Gaspardo*, 30 Mich App 292, 293-294; 186 NW2d 75 (1971). We would agree with the reasoning set forth in the dissenting opinions of Judge METER in *Phillips, supra,* and Judge FITZGERALD in *Zdrojewski, supra,*[5] both concluding that the cap on noneconomic damages was unconstitutional in their respective cases. Judge METER, in his opinion, provided the following synopsis of why an analogous noneconomic damages cap violated the right to trial by jury:

> Because our constitution confers a right to trial by jury, and because the right to trial by jury in Michigan extends to a determination of damages, the damages cap in the instant case is unconstitutional. Indeed, if the trial court must automatically reduce the amount of damages assessed by the jury to conform to the statutory cap, then the jury is not "fix[ing] the amount of damages" as required by *Leary* [*supra*]. [*Phillips, supra* at 599-600.]

In *Zdrojewski, supra,* this Court based its decision, in part, on its determination that the Legislature has

---

[5] It is noted that Judge FITZGERALD's dissent in *Zdrojewski, supra,* basically adopts the reasoning set forth in Judge METER's dissent in *Phillips, supra.*

the authority to change or abolish tort actions and the ability to limit remedies. *Zdrojewski, supra* at 77-78. Judge METER, in his dissent in *Phillips, supra,* addressed this argument and the reason why the Legislature could abolish a cause of action, but not limit damages recoverable on a cause of action as follows:

> The fatal flaw with this argument is that the existence of a particular cause of action, at least in many instances, is not mandated *by the constitution.* Many causes of action are creatures of the Legislature, and therefore the Legislature is free to abolish these causes of action. The right to a jury trial, on the other hand, is indeed mandated by the constitution, as discussed earlier. Accordingly, the Legislature is *not free* to abrogate this right. In other words, while the Legislature may take away what *it* has given, it may not take away what *the constitution* has given. [*Phillips, supra* at 600 (emphasis in original).]

With regard to the noneconomic damages cap, we agree with Judge METER that having the jury determine the facts and the amount of damages for an injured plaintiff and then "arbitrarily reducing this amount to a prescribed statutory number renders the jury's function purely illusory." *Id.* at 601. The Michigan Constitution guarantees a plaintiff the right to a jury trial with regard to damages, and to *arbitrarily* reduce damages assessed by the jury without any kind of finding that the damages are unsupported by the evidence[6] presented violates a plaintiff's "right of trial by jury." Const 1963, art 1, § 14.

---

[6] In comparing remittitur, Judge METER indicated that it differed from a damages cap because remittitur still involves a component of judicial discretion in determining whether the evidence supports the damages, and that this necessary judicial discretion is not provided for in a statutory cap on noneconomic damages. *Phillips, supra* at 603.

For the forgoing reasons and the reasons articulated in Judge METER's dissent in *Phillips, supra,* and Judge FITZGERALD's dissent in *Zdrojewski, supra,* we believe that this Court's decision in *Zdrojewski* was incorrect and should be overruled because MCL 600.1483 violates the right to a trial by jury.[7] However, pursuant to MCR 7.215(J)(1), this Court must follow that precedent. Because we are required to follow *Zdrojewski, supra,* we find that the trial court erred in ruling that the cap is unconstitutional.[8]

### B. ORDINARY NEGLIGENCE OR MEDICAL MALPRACTICE?

Plaintiff argues that this case involved ordinary negligence, rather than medical malpractice. We disagree.

Our Supreme Court recently set forth the test for determining whether a case involves negligence or medical malpractice in *Doris v Detroit Osteopathic Hosp Corp,* 460 Mich 26; 594 NW2d 455 (1999). The Court noted, " '[A] complaint cannot avoid the application of the procedural requirements of a malpractice action by couching its cause of action in terms of ordinary negligence.' " *Id.* at 43, quoting *McLeod v*

---

[7] Further support for our finding can be found in *Sofie v Fibreboard Corp,* 112 Wash 2d 636; 771 P2d 711 (1989), where the Washington Supreme Court struck down a damages cap as unconstitutional on the basis of the state constitutional right to trial by jury stating, "[t]he Legislature has the power to shape litigation. Such power, however, has its limits: it must not encroach upon constitutional protections. In this case, by denying litigants an essential function of the jury, the Legislature has exceeded those limits." *Id.* at 651.

[8] In light of the finding in favor of defendant, it is unnecessary to address whether plaintiff waived this issue by not raising it before the trial court. Regardless, this issue is without merit because the issue was raised, albeit by the trial court, and addressed by the trial court, which is required to uphold the Michigan Constitution.

*Plymouth Court Nursing Home*, 957 F Supp 113, 115 (ED Mich, 1997), citing *MacDonald v Barbarotto*, 161 Mich App 542; 411 NW2d 747 (1987). The Court held:

> The determination whether a claim will be held to the standards of proof and procedural requirements of a medical malpractice claim as opposed to an ordinary negligence claim depends on whether the facts allegedly raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment. [*Id.* at 46, citing *Wilson v Stilwill*, 411 Mich 587, 611; 309 NW2d 898 (1981); *McLeod, supra* at 115.]

The Court ruled that the plaintiff's allegations involving staffing decisions and patient monitoring involved questions of professional medical management and not ordinary negligence because "[t]he ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in a psychiatric ward." *Id.* at 47.

In a case factually similar to this case, the plaintiff alleged she was injured when a technician negligently assisted her from a wheelchair onto an examination table. *Regalski v Cardiology Assoc, PC*, 459 Mich 891; 587 NW2d 502 (1998). The Court held that the technician was " 'engaging in or otherwise assisting in medical care and treatment.' " *Id.* at 891 (quoting the trial court). On the basis of *Doris, supra,* and *Regalski, supra,* we find that plaintiff's claim was of medical malpractice because an ordinary layman lacks knowledge regarding the appropriate methods and techniques for transferring patients. Reading the claim as a whole, it is clear that plaintiff's claim against defendant sounded in medical malpractice. Plaintiff alleged that John Doe was an agent or employee of defendant. Against John Doe, plaintiff alleged that Doe's

transfer of plaintiff breached the duty of ordinary care. Against defendant, plaintiff alleged that the failure to properly transfer plaintiff was medical malpractice. Additionally, the count against defendant was labeled as medical malpractice. Thus, the only claim against defendant was one of medical malpractice.

Furthermore, plaintiff's proofs and closing argument all clearly show that plaintiff was trying a medical malpractice case. During trial, plaintiff called a nursing expert and asked questions regarding the standard of care. In closing argument, plaintiff's counsel argued: "The defendants in this case were professionally negligent in their care of Ms. Wiley in their hospital. They violated nursing standards. They didn't prevent risk of injury to Mrs. Wiley's remaining extremity. The transfer of Mrs. Wiley on 3-29 from the toilet to the wheelchair was done in an unsafe, nonnursing professional manner and that caused injury to her."[9]

This conclusion is also supported by the trial court's instructions to the jury on professional negligence. The trial court instructed, without objection: "Your verdict will be for the defendant if the defendant was not professionally negligent and did not commit malpractice; or if the defendant was professionally negligent or did commit malpractice, such professional negligence or malpractice was not a

---

[9] Plaintiff also stated in closing argument: "Dr. Park—since this isn't a medical case, we don't talk about Dr. Park too much, although for whatever benefit, his deposition was read to you." However, in light of the rest of the record, it is clear that plaintiff, although claiming medical malpractice with regard to nursing care, was not claiming medical malpractice against the doctors who treated plaintiff's leg after the laceration occurred.

proximate cause of plaintiff's injuries." The verdict form also indicates that the case was tried as one of medical malpractice, not ordinary negligence. It read: "Was the defendant, Henry Ford Cottage Hospital, professionally negligent?"

In conclusion, because this Court is constrained by MCR 7.215(J)(1) to follow *Zdrojewski, supra,* we find the trial court erred in ruling that MCL 600.1483 was unconstitutional and in denying defendant's request that the cap on noneconomic damages be applied to this case. Were it not for *Zdrojewski, supra,* we would affirm the trial court's order of judgment in its entirety. However, because of *Zdrojewski, supra,* this must be remanded for application of the cap on noneconomic damages.

Affirmed in part, reversed in part, and remanded for application of the cap on noneconomic damages. We do not retain jurisdiction.

Fort Hood, J., concurred.

Kelly, J. (*concurring in part and dissenting in part*). I agree with the majority's opinion in all respects other than, its conclusion that this Court's decision in *Zdrojewski v Murphy,* 254 Mich App 50, 74-82; 657 NW2d 721 (2002), was incorrect and should be overruled. To the contrary, I agree with the reasoning and analysis applied by Judge Bandstra in his opinion in *Zdrojewski,* as well as that of Judge Hoekstra in *Phillips v Mirac, Inc,* 251 Mich App 586; 651 NW2d 437 (2002). The statutory cap on noneconomic damages set forth in MCL 600.1483 does not violate the Michigan Constitution.